UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------x
LUIS MORENO,

                Petitioner,                        **MEMORANDUM & ORDER**

          v.                                          No. 19-CV-3660 (RPK)

JAIME LAMANNA,

                Respondent.
-----------------------------------------------------------------x
RACHEL P. KOVNER, United States District Judge:

      Petitioner Luis Moreno is currently serving a state prison sentence after being convicted of second-degree murder and criminal possession of a weapon in New York state court. The state appellate court affirmed petitioner's convictions on direct appeal, and he unsuccessfully sought state post-conviction relief. Petitioner now petitions for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. As explained below, the petition is denied.

## BACKGROUND

**I.  Factual Background**

      The following facts are taken from the state court record and are viewed in the light most favorable to the prosecution. *See Cavazos v. Smith*, 565 U.S. 1, 7 (2011) (per curiam); *McDaniel v. Brown*, 558 U.S. 120, 133 (2010) (per curiam).

    A.  *March 2, 2013, Murder*

      Around 4:00 p.m. on March 2, 2013, Santos Martinez was walking from his home in Hempstead, Nassau County, to a deli on Clinton Street. Tr. 466–67 (Dkt. #7-25).[1] On his way there, Martinez stopped behind a laundromat located on Clinton Street to urinate. *Id.* at 467.

---

[1] The seven-day trial transcript is consecutively paginated and docketed in multiple exhibits. *See* Dkts. #7-24, 7-25, and 7-26.

1

There, Martinez saw three men he recognized: "Tonio," who seemed to be intoxicated to the point of unconsciousness; a second man wearing dark clothing (petitioner), whom Martinez recognized from around the neighborhood; and a third man (the decedent), whom Martinez had seen in the neighborhood several times in the past. *Id.* at 468–70, 478–82. Petitioner and the decedent were engaged in conversation. *Id.* at 468. Although Martinez recognized petitioner and the decedent, he did not know their names at the time. *Id.* at 469, 479.

Martinez left the area behind the laundromat without saying anything to the men. *Id.* at 468, 470, 482–83. He walked to the nearby deli where he purchased food and ate. *Id.* at 471–72, 487–88. While still inside the deli, approximately ten to twelve minutes after he left the laundromat area, Martinez saw police arrive. *Id.* at 472, 487–88. Martinez overheard that someone was found dead near the laundromat and later learned that it was the man he had seen talking to petitioner. *Id.* at 480, 496–97.

Meanwhile, around the same time, Glenis Paz was painting her nails by her bedroom window, which faces the back of the laundromat. *Id.* at 574–75. Paz noticed three men in that area. *Id.* at 575. One of the men—later identified by other witnesses as petitioner—was wearing a black jacket with a black hat and had a black bicycle with a red stripe in the middle. *Id.* at 575–76. Another man—later identified as the decedent—was wearing a black jacket with white stripes on the arms. *Id.* at 575. A third man was lying on the ground while petitioner lifted the man's head and slapped his face in an apparent attempt to wake him. *Id.* at 575–77, 609.

After a few minutes, Paz saw petitioner and the decedent leave the area in different directions. *Id.* at 577. About five minutes later, the decedent came back to the rear of the laundromat and whistled to petitioner. *Id.* at 577, 613–14. Petitioner then returned and the two men met near a wood pile directly in front of Paz's window, but not close enough for her to see

2

their faces. *Id.* at 578–79.  The men engaged in conversation for about five minutes until it turned into an argument. *Id.* at 579–80, 592, 594–95.  The two men appeared to be accusing each other of something, and the decedent was preventing petitioner from approaching the man lying on the ground. *Id.* at 621–26.  Paz overheard one of the men say, "No, leave him" or "Leave him alone," and saw the decedent physically block petitioner from getting near the other man. *Id.* at 579–80, 593, 595–96, 621–24, 626.  A struggle ensued; petitioner grabbed the decedent's jacket and started hitting him. *Id.* at 580–81, 585, 596.  After less than a minute of the men exchanging blows, petitioner took a knife from his back pocket and thrust his hand in a stabbing motion at the decedent. *Id.* at 581, 583, 584.  Petitioner was "furious" and "angry," stabbing the decedent repeatedly in the stomach and also in the back of his shoulder. *Id.* at 584.  The decedent eventually wriggled out of his jacket and escaped. *Id.* at 581, 587.  Ms. Paz noticed that there were red spots on his left side and abdomen. *Id.* at 581.  Petitioner then picked up the decedent's jacket, wiped his knife blade on the jacket, and put it on his bicycle before riding away. *Id.* at 582, 587–89, 598–99.

At 4:28 p.m., Hempstead Police Officer Eugene Este received a call notifying him that there was a "man down" on Lincoln Boulevard. *Id.* at 428, 439.  When he arrived, Officer Este found the decedent lying face-up near an entrance to Brierley Park at the end of the street; he had no pulse and was not breathing. *Id.* at 430–31, 436–37, 450, 455.  An ambulance transported the decedent to the hospital. *Id.* at 432–33.

B. *Police Investigation*

Nassau County Police Homicide Detective Robert Nardo subsequently responded to the crime scene along with Detective Frederick Goldman and Sergeant John Espina. Tr. 680–83, 728

3

(Dkt. #7-26). The investigation began with a search for any eyewitnesses or video of the incident, including surveillance footage from area businesses. *Id.* at 683, 684.

Police recovered surveillance video from a nearby liquor store, which included various angles of the store's interior and exterior. *Id.* at 688. That video showed petitioner, the decedent, and Antonio "Tonio" Manzanares together inside the liquor store on March 2, 2013, less than two hours before the murder. *Id.* at 690–92, 725. On the interior surveillance video, petitioner could be seen touching liquor bottles on the shelves, from which latent fingerprints were lifted and matched to those of petitioner. *Id.* at 690–91. Petitioner was also seen in the exterior video riding a bicycle with distinctive fenders on the back tire and a red cable lock around the bike frame. *Id.* at 690. The police extracted still images from the liquor-store videos, which they used to show witnesses. *Id.* at 695–96.

As police canvassed the area, Detective Goldman entered the deli on Clinton Street and spoke with deli clerk Stephanie Moran. *Id.* at 758. Moran told the detective that the decedent, whom she knew as "Noel," went to the deli every day. She stated that the decedent had been in the deli that day until about 1:00 or 2:00 p.m. and was wearing a black jacket with white stripes on each shoulder and khaki pants. *Id.* at 759–60, 764. Later that day, Moran went to the liquor store to view the surveillance video with Detective Goldman. *Id.* at 760. On the video, she saw "Noel" wearing a dark jacket, along with Antonio and a third person, whom she later identified as petitioner. *Id.* at 761. She knew Antonio well because he was always in and around the deli. Moran had seen petitioner a few times but did not know his name. *Id.* at 761–62.

Another surveillance video obtained by police was from a church on Clinton Street, with its camera facing Brierley Park, south of the laundromat. *Id.* at 692. That video depicted a man riding a bicycle with a rear fender, wearing dark clothing and something on his head, at

4

approximately 4:24 p.m. on March 2, 2013. *Id.* at 692–93. Yet another surveillance video, obtained from the water tower at Clinton Street and Dartmouth Street, showed a man on a bicycle with dark clothing and a hood, going westbound on Dartmouth Street at approximately 4:25 p.m. on March 2, 2013. *Id.* at 693–94.

On March 19, 2023, a surveillance video was obtained from a private residence at 420 Clinton Street, which had a view of Brierly Park right behind the laundromat. *Id.* at 696–97, 726. The video showed the events as described by Paz. *Id.* at 590–99; *see supra* pp. 2–3. After police viewed the video from 420 Clinton Street, the man with the bicycle—petitioner—became a suspect in the homicide investigation. *Id.* at 697, 726.

C. March 24, 2013, Arrest

When Moran arrived for work at the deli on March 24, 2013, she recognized a patron as the third man from the liquor store video she viewed with Detective Goldman. *Id*. at 762. Moran called Detective Goldman and told him that the person she had seen on the surveillance video was in the deli. *Id.* at 762. Detective Goldman immediately contacted Hempstead Police, who could respond quickly, and directed them to effectuate the arrest. Officer James Morris received the radio call for a person wanted in connection with a homicide, and promptly reported to the deli. *Id.* at 630–31. The description he received was a "male Hispanic, about five feet six inches, wearing a black and red baseball cap [and] headphones." *Id.* at 632. He arrived at the deli in less than one minute and saw two Hispanic men standing in front of the deli. *Id.* at 631. One man, petitioner, matched the description except for the fact that he was wearing earphones instead of headphones. *Ibid.* Officer Morris entered the deli and spoke to Moran. He then went back outside and placed petitioner under arrest. *Id.* at 633, 763.

5

Officer Morris transported petitioner to the Hempstead Police Department at around 1:00 p.m. *Id.* at 636–37. At approximately 3:00 p.m., Nassau County Detective Nardo and Sergeant Espina arrived at HPD headquarters. *Id.* at 638, 699, 744. After reviewing the surveillance video images, Detective Nardo and Sergeant Espina determined that petitioner was the man in the images. *Id*. at 700, 744, 780. They subsequently transported petitioner to Nassau County Homicide Division. *Id*. at 639, 701. During the ride there, Detective Nardo and Sergeant Espina did not talk to petitioner other than to explain where they were taking him and confirm that an injury petitioner had complained about was pre-existing to his arrest. *Id*. at 701–02, 731, 732, 745, 780.

Upon arrival, petitioner was taken to an interview room and advised of his *Miranda* rights in both English and Spanish. *Id.* at 703–06, 746–47. Petitioner indicated that he understood his rights and waived them. *Id.* at 705–06. Petitioner was also advised, in Spanish, of his right to refuse consent to a search of his residence, but he signed a written consent form allowing the police to search his residence. *Id.* 767–68, 771. Petitioner described where the boots he was wearing at the time of the murder could be found in the residence, and they were recovered during the search. *Id.* at 736–38, 771.

During the videotaped interview, petitioner acknowledged that he was with the decedent and Antonio in the park behind the laundromat on March 2, 2013. Interview Tr. 2 (Dkt. #11). Petitioner said he was riding his bicycle, which was black and white with a red lock on the bar "in the middle." *Id*. at 3, 8. Petitioner stated that "Antonio was drinking a lot" and had fallen asleep. *Id*. at 3. After leaving the park and then returning, petitioner stated that the decedent became aggressive. According to petitioner:

> "I gave to him some money to buy some stuff like food, drinks. He went and I was waiting for him. We made a deal and I was waiting for him. When he came back, he didn't say

6

> anything. I said, 'Where is the stuff?' He said, 'I don't give you anything.' He went to my face very close and he said to me, 'I don't give you anything.' And I said, 'But it's my money. Give me the change or give me the stuff.'"

*Ibid*. Petitioner said to himself, "This guy he gonna kill me." *Ibid*. Petitioner had been told by someone that the decedent "always carries a knife" and liked to use it. *Id*. at 4. At first, petitioner stated that he was "scared of that moment," *id*. at 15, but later stated that he got "mad when [the decedent] do that to me. He deny my stuff, my change. I get mad. But he went to my face," *id*. at 18.

Although the decedent did not appear to have a weapon, petitioner stated: "I saw his, he act so crazy, and I saw in his eyes he going to really stick to me. And I get mad at that moment, so I lost the control and I have no choice and I stick it in him." *Ibid*.

Petitioner also told the detectives that after he stabbed the decedent, he disposed of his bloody clothes, the knife, and his bicycle. *Id*. at 5.

### II. Procedural History

A grand jury indicted petitioner on one count of murder in the second degree pursuant to N.Y. Penal Law § 125.25[1] and one count of criminal possession of a weapon in the fourth degree pursuant to N.Y. Penal Law § 265.01[2].

### A. Suppression Hearing

From March 31 through April 2, 2015, the Honorable Helene F. Gugerty conducted a suppression hearing to determine whether the arrest of petitioner was supported by probable cause and the admissibility of (1) petitioner's statements to detectives, (2) physical evidence recovered from his residence, and (3) testimony regarding the identification of petitioner. Detective Goldman, Sergeant Espina, and Officer Morris testified about the sequence of events described above. *See generally* Hearing Transcript (Dkt. #7-17). Detective Goldman explained how, within a day of the murder, police showed the liquor store surveillance video to Stephanie Moran, who

recognized all three men in the video and whose recognition of petitioner prompted her to contact police on March 24, 2013.  Hearing Tr. 110, 117–18, 123, 132–34.  The day after petitioner's arrest, Detective Goldman showed Moran a photographic array containing six photographs and asked whether she recognized anyone in the array.  *Id.* at 123–26.  Moran identified petitioner's photo as showing the person she saw on the liquor-store video, whom she recognized as a past customer and saw at the deli on March 24.  *Id.* at 127.

Sergeant Espina also testified about his March 6, 2013, interview of witness Santos Martinez.  Martinez stated in the interview that he saw petitioner, the decedent, and "Tonio" together behind the laundromat shortly before the murder on March 2.  *Id.* at 35–36, 86.  At the end of that interview, officers showed Martinez the still images extracted from the liquor-store surveillance video and asked Martinez to notify them if he later saw the person shown in the photographs.  *Id.* at 93, 105.  The police did not ask Martinez if the man in the photographs was the same person that Martinez saw with the decedent behind the laundromat, nor did the police tell him that the person in the photographs was a murder suspect.  *Id.* at 93–95, 105.

On March 26, 2013, after petitioner's arrest, Sergeant Espina showed Martinez a photo array and asked whether he recognized anyone.  *Id.* at 38–43.  Martinez indicated that petitioner, the person in position number 3, was the person he saw behind the laundromat with the decedent, approximately fifteen minutes before the decedent was killed.  *Id.* at 43.  The police did not mention the still images they had shown Martinez almost three weeks earlier.  *Id.* at 98–99.

The court also reviewed the video of petitioner's custodial interview, as well as the photo arrays, surveillance videos, and signed consent forms.  *See id.* at 40–41, 56, 58, 66–67, 114–16, 119–22, 125.

8

The court denied the motion to suppress, concluding that probable cause supported petitioner's arrest. *See* Mot. to Suppress Dec. 5 (Dkt. #7-18). Noting that defense counsel conceded there was no improper conduct by police in obtaining statements from petitioner, the court found that petitioner's consent to waive his *Miranda* rights was knowing, voluntary, and intelligent. *Id.* at 5–6; *see* Hearing Tr. 140–41.

The court further found that the post-arrest photo arrays shown to Santos Martinez and Stephanie Moran were not unduly suggestive. Mot. to Suppress Dec. 6–7. The court rejected petitioner's argument that the photo array was tainted because over two weeks earlier, police showed Martinez still photographs of petitioner taken from the liquor store surveillance video. *Id.* at 7. The court noted that, when showing Martinez the still images, police did not link the person in the photographs to the person Martinez saw behind the laundromat. *Ibid.* Moreover, when conducting the March 26 photo array procedure, police did not mention the still photos from the liquor store surveillance video. *Ibid.* Finally, the court found that defendant freely and voluntarily gave consent to search his room. *Id.* at 8.

B. *Trial and Sentencing*

A jury trial began before Judge Gugerty on June 8, 2015. The People's evidence established the events as described above. *See* pp. 1–7, *supra*. The defense did not put forth any evidence of its own, instead arguing in summation that petitioner was justified in his actions because he believed that the decedent was going to use deadly force against him first. Tr. 841, 849, 869–71. The jury found petitioner guilty of second-degree murder and fourth-degree criminal possession of a weapon. Tr. 947–49.

9

The trial court sentenced petitioner to an indeterminate term of imprisonment of twenty-five years to life on the murder conviction and a concurrent term of one-year imprisonment for weapon possession. *See* Sentencing Tr. 6–7 (Dkt. #7-19).

C. *Direct Appeal*

Petitioner appealed his convictions, arguing that the trial court improperly declined to suppress his police statement and the witness-identification testimony, and challenging both the sufficiency and weight of the evidence to convict him of murder. *See* Pet.'s App. Br. (Dkt. #7-1). Specifically, petitioner claimed that he was denied a fair trial because: (1) his arrest was without probable cause where the arrest was based only on an "unnecessarily suggestive identification procedure" and no physical evidence, *id.* at 35–37; (2) his subsequent custodial interview was not excluded as fruit of the poisonous tree, even though it was not conducted in his native Spanish, *id.* at 37, 51–54; (3) the prosecution did not provide notice of identifying witnesses' prior police interactions pursuant to New York Criminal Procedure Law ("N.Y. C.P.L.") § 710.30, *id.* at 37–38; and (4) the post-arrest identifications made by Martinez and Moran were both tainted by their earlier exposures to the video surveillance footage, *id.* at 38–41. Petitioner also argued that the prosecution failed to prove beyond a reasonable doubt that his use of deadly force was not justified. *See id.* at 51–54. Therefore, petitioner claimed, the jury's verdict on the murder charge was also against the weight of the evidence. *Id.* at 54–58.

The appellate division affirmed petitioner's convictions. *See People v. Moreno*, 48 N.Y.S.3d 721 (App. Div. 2017); Decision & Order (Dkt. #7-5). The court found that petitioner's arrest was supported by probable cause. *Moreno*, 48 N.Y.S.3d at 722. It further concluded that petitioner's police statement was admissible at trial because "the detailed statement that he gave in English demonstrated that he had a sufficient command of the English language to participate

10

in the questioning in English" and petitioner's argument that the photo array was unduly suggestive was without merit where "[a]ny possible taint . . . dissipated with the passage of time" between witnesses' viewing of surveillance footage and their later participation in the photo array procedure. *Id.* at 722–23.  Finally, the court held that neither petitioner's argument that he did not receive notice of witnesses' prior interactions with police, nor his challenge to the sufficiency and weight of the evidence, were properly preserved for appellate review. *Ibid.*  In any event, the court found those claims to be without merit. *Ibid.*

On May 10, 2017, the New York Court of Appeals denied petitioner's application for leave to appeal. *See People v. Moreno*, 84 N.E.3d 976 (N.Y. 2017).

D. *440.10 Proceeding*

On July 30, 2018, petitioner filed a *pro se* motion to vacate his conviction pursuant to N.Y. C.P.L. § 440.10.  *See* Pet.'s Post-Conviction Mot. & Aff. (Dkt. #7-20).  Petitioner argued that his trial counsel was ineffective for failing to properly advise petitioner on the prosecution's pretrial plea offer. *Id.* ¶¶ 3–7.  Petitioner claimed to have misunderstood the offer, believing that it would carry a sentence of twenty years to life imprisonment, rather than a determinate term of twenty years of imprisonment if he pled guilty to manslaughter. *Id.* ¶ 3–4.  Counsel's failure to expressly state this, according to petitioner, unreasonably induced petitioner to reject the offer. *Id.* ¶¶ 5–6.

The trial court, sitting as the state post-conviction court, denied petitioner's motion on January 11, 2019. *See* Post-Conviction Order (Dkt. #7-23).  The court found that, under the totality of the circumstances, trial counsel provided petitioner with "meaningful representation." *See id.* at 3.  It found unpersuasive petitioner's "unsupported and self-serving statement" that he would have accepted the plea offer had he known it did not carry a life sentence. *Ibid.*  Additionally, the court noted that petitioner brought his motion three years after trial with no justification as to why

11

he waited that long to raise the issue, a fact which weighed against the credibility of his post-conviction argument. *See ibid.*

Petitioner sought leave to appeal on February 15, 2019, *see* Pet.'s Mot. for Leave to Appeal (Dkt. #7-7), but on July 16, 2019, the appellate division denied his request. *See* Dec. & Order on App. (Dkt. #7-12).

E. *Federal Habeas Petition*

Petitioner filed the instant *pro se* petition for relief under 28 U.S.C. § 2254 on June 19, 2019, raising four grounds for relief:

*First*, petitioner contends that the trial court erred in denying his motion to suppress and determining that his arrest was supported by probable cause. Pet. 6.

*Second*, petitioner asserts that the prosecution failed to prove beyond a reasonable doubt that he "was not justified in his belief that the decedent was about to use deadly physical force against him." *Id.* at 7–8.

*Third*, petitioner alleges that both the trial court and counsel failed to advise him "about his sentencing exposure." *Id.* at 9–10.

*Fourth*, and relatedly, petitioner claims that trial counsel was ineffective for failing to properly advise petitioner on the content of the pretrial plea offer, causing him to reject the plea offer of twenty years and go to trial, after which he was sentenced to twenty-five years to life term of imprisonment. *Id.* at 10–11; *see* Pet.'s Reply Br. (Dkt #9).

## STANDARD OF REVIEW

A person in custody pursuant to a state-court judgment may seek a writ of habeas corpus on the ground that he is being held "in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). Under Section 2254, subject to exceptions not applicable here, a

federal court may review a petitioner's claims only if the applicant has exhausted the remedies available to him in the courts of his state. 28 U.S.C. § 2254(b)(1)(A). "State remedies are deemed exhausted when a petitioner has: (i) presented the federal constitutional claim asserted in the petition to the highest state court . . . and (ii) informed that court (and lower courts) about both the factual and legal bases for the federal claim." *Ramirez v. Att'y Gen. of N.Y.*, 280 F.3d 87, 94 (2d Cir. 2001) (citing *Picard v. Connor*, 404 U.S. 270, 276–77 (1971)).

Federal review of state convictions is circumscribed by the related doctrine of procedural default. "[A] claim is procedurally defaulted for the purposes of federal habeas review where 'the petitioner failed to exhaust state remedies and the court to which the petitioner would be required to present his claims in order to meet the exhaustion requirement would now find the claims procedurally barred.'" *Reyes v. Keane*, 118 F.3d 136, 140 (2d Cir. 1997) (emphasis omitted) (quoting *Coleman v. Thompson*, 501 U.S. 722, 735 (1991)). "Out of respect for finality, comity, and the orderly administration of justice," federal courts generally may not entertain such defaulted claims through habeas unless the petitioner shows "cause and prejudice to excuse the default." *Dretke v. Haley*, 541 U.S. 386, 388 (2004). A state prisoner who fails to make those showings can only receive habeas review if he "advance[s] . . . a credible and compelling claim of actual innocence," *Hyman v. Brown*, 927 F.3d 639, 656 (2d Cir. 2019) (quoting *Rivas v. Fischer*, 687 F.3d 514, 540 (2d Cir. 2012)), such that "failure to consider the claim[] will result in a fundamental miscarriage of justice," *Coleman*, 501 U.S. at 750.

Section 2254 also constrains federal review of even those claims that have been properly preserved. So long as a state court adjudicated a litigant's claim on the merits, a federal court may grant habeas relief only if the state court's decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United

13

States" or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1)–(2).

"Clearly established Federal law" refers to "the holdings, as opposed to the dicta, of the Supreme Court's decisions as of the time of the relevant state-court decision." *Green v. Travis*, 414 F.3d 288, 296 (2d Cir. 2005) (alterations omitted) (quoting *Williams v. Taylor*, 529 U.S. 362, 412 (2000)). A state court decision is "contrary to" clearly established federal law as determined by the Supreme Court if it "arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law" or if the state court decides a case differently from how the Supreme Court decided a case "on a set of materially indistinguishable facts." *Williams*, 529 U.S. at 412–13. A decision involves an "unreasonable application" of clearly established federal law if the state court "identifies the correct governing legal rule from [the Supreme] Court's cases but unreasonably applies it to the facts of the particular state prisoner's case," *id.* at 413, meaning there is "no possibility fair-minded jurists could disagree that the state court's decision conflicts with [Supreme Court] precedents," *Harrington v. Richter*, 562 U.S. 86, 102 (2011). Finally, a determination that a state-court decision was "based on an unreasonable determination of the facts," 28 U.S.C. § 2254(d)(2), requires more than that a federal court conducting habeas review "would have reached a different conclusion in the first instance." *Brumfield v. Cain*, 576 U.S. 305, 313–14 (2015) (quotation marks omitted) (quoting *Wood v. Allen*, 558 U.S. 290, 301 (2010)). "If the state record is 'ambiguous' such that two different views of the facts find fair support in the record," Section 2254 "mandates deference to the state court's fact-finding." *Washington v. Schriver*, 255 F.3d 45, 55 (2d Cir. 2001) (citation omitted).

These standards are "intentionally 'difficult to meet,'" *Woods v. Donald*, 575 U.S. 312, 316 (2015) (quoting *White v. Woodall*, 572 U.S. 415, 418 (2014)), because federal habeas review is

14

"a 'guard against extreme malfunctions in the state criminal justice systems,'" not "a means of error correction," *Greene v. Fisher*, 565 U.S. 34, 43 (2011) (quoting *Richter*, 562 U.S. at 102–03).

## DISCUSSION

For the reasons discussed below, petitioner has not demonstrated that he is entitled to relief on any of his claims.

### I.  Petitioner's Fourth Amendment Claim Is Not Cognizable on Habeas

Petitioner first argues that he was denied his right to a fair trial when the hearing court denied his motion to suppress evidence derived from his arrest. *See* Pet. 6. Specifically, petitioner maintains that because there was no probable cause for arrest, the hearing court should have suppressed any evidence derived from his arrest, including petitioner's own confession to police. *Ibid.*

These claims are not cognizable on federal habeas review. A claim that officers lacked probable cause for arrest arises under the Fourth Amendment. *See, e.g.*, *Jackson v. Scully*, 781 F.2d 291, 297 (2d Cir. 1986). "[A] petitioner may not obtain habeas relief under the Fourth Amendment on the ground that the state court declined to suppress evidence obtained in an unlawful search if he had a full and fair opportunity to litigate the claim in state court." *Ethridge v. Bell*, 49 F.4th 674, 681 (2d Cir. 2022) (citing *Stone v. Powell*, 428 U.S. 465, 494 (1976)); *see Brown v. Davenport,* 596 U.S. 118, 132–33 (2022). Under that logic, habeas relief based upon an asserted Fourth Amendment violation is available only if the petitioner "shows that the state denied him an opportunity for full and fair litigation of [that] claim," meaning "either that 'the state has provided no corrective procedures at all to redress the alleged fourth amendment violations,' or, 'if the state has provided a corrective mechanism,' that the petitioner 'was precluded from using

15

that mechanism because of an unconscionable breakdown in the underlying process.'" *Ethridge*, 49 F.4th at 684 (quoting *Capellan v. Riley*, 975 F.2d 67, 70 (2d Cir. 1992)).

Petitioner cannot make the required showing because he was given a full and fair opportunity to litigate his Fourth Amendment claim in state court. Consistent with New York's procedural mechanism for Fourth Amendment claims, the trial court held a suppression hearing before trial. *See* N.Y. C.P.L. § 710.60. And "federal courts have approved New York's procedure" as "facially adequate" for providing a full and fair opportunity to litigate Fourth Amendment claims. *Capellan*, 975 F.2d at 70 n.1 (quoting *Holmes v. Scully*, 706 F. Supp. 195, 201 (E.D.N.Y. 1989)). Petitioner does not argue that those procedures suffered an "unconscionable breakdown," *see, e.g.*, *White v. West*, No. 04-cv-02886, 2010 WL 5300526, at *13 (E.D.N.Y. Dec 6., 2010), and there is nothing in the record to suggest that the suppression hearing and subsequent appeal were disrupted, obstructed, or deficient in any way, *see Capellan*, 975 F.2d at 80. Accordingly, petitioner's claim that he was arrested without probable cause is denied.

## II. Petitioner's Sufficiency of the Evidence Claim Is Procedurally Barred

Petitioner next claims that the prosecution failed to prove that he "was not justified in his belief that the decedent, who was the first aggressor, was about to use deadly physical force against him." Pet. 7–8. This claim is barred because the appellate division rejected this claim on independent and adequate state grounds. *See Harris v. Reed*, 489 U.S. 255 (1989). Petitioner did not raise this claim until on direct appeal, where the state appellate court held that he "failed to preserve for appellate review his contention regarding the legal sufficiency of the evidence." *People v. Moreno*, 48 N.Y.S.3d 721, 723 (App. Div. 2017) (citing *People v. Gray*, 652 N.E.2d 919, 921 (N.Y. 1995)); *see also* Decision & Order. Where the "state court decline[s] to address [a petitioner's] federal claim[] because [he] had failed to meet a state procedural requirement," that

16

claim is ineligible for habeas review. *Coleman*, 501 U.S. at 729–30; *see Garvey v. Duncan*, 485 F.3d 709, 720 (2d Cir. 2007) ("[T]he procedural bar of [N.Y. C.P.L.] § 470.05(2) constitutes an independent and adequate state ground for the Appellate Division's holding."). Here, the state court "expressly relied on a procedural default as an independent and adequate state ground" for rejecting petitioner's sufficiency claim on direct appeal, and therefore this Court will not now consider the federal issue. *Velasquez v. Leonardo*, 898 F.2d 7, 9 (2d Cir. 1990); *see Garvey*, 485 F.3d at 713, 717–18.[2]

### III. Petitioner's Ineffective Assistance of Counsel Claim Lacks Merit

Petitioner's final claim is that his trial counsel was ineffective because he failed to properly advise petitioner on the content of a plea offer, causing petitioner to "turn down an offer of [twenty years] (determinate) only to be sentenced to [twenty-five] years to life (indeterminate) after a jury trial." Pet. 10–11; s*ee also* Pet.'s Reply Br. (Dkt #9). Relatedly, petitioner claims, without explanation, that both the trial court and counsel failed to advise him "about his sentencing exposure." Pet. 9. Petitioner has not demonstrated that the state court's rejection of his ineffective assistance of counsel claim was "contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court," or "was based on an unreasonable

---

[2] To the extent petitioner claims that his murder conviction was not "supported by the credible weight of the evidence," *see* Pet. 7 (Dkt. #1), such a claim is not cognizable on federal habeas review. "'Weight of the evidence' claims stem from N.Y. C.P.L. § 470.15(5), which allows an intermediate appellate court to reverse or modify a conviction where the court determines that the verdict was, in whole or in part, against the weight of the evidence, meaning that the 'trier of fact has failed to give the evidence the weight it should be accorded.'" *Nylander v. Smith*, No. 07-CV-457 (SLT), 2010 WL 1292297, at *6 (E.D.N.Y. Mar. 30, 2010) (quoting *People v. Bleakley*, 508 N.E.2d 672, 675 (N.Y. 1987)). Accordingly, "the argument that a verdict is against the weight of the evidence states a claim under state law, which is not cognizable on habeas corpus" in federal court. *McKinnon v. Superintendent, Great Meadow Corr. Facility*, 422 F. App'x 69, 75 (2d Cir. 2011); *see Correa v. Duncan,* 172 F. Supp. 2d 378, 381 (E.D.N.Y. 2001) (explaining that, because "[a] 'weight of the evidence' argument is a pure state law claim grounded in New York Criminal Procedure Law § 470.15(5)," federal habeas courts are "precluded from considering [such] claim[s]").

determination of the facts in light of the evidence presented in the State court proceeding," 28 U.S.C. 2554(d).

To establish ineffective assistance of counsel, a petitioner must show that (1) his "counsel's representation fell below an objective standard of reasonableness," and (2) "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland v. Washington*, 466 U.S. 668, 687–88, 694 (1984). The review of an attorney's performance, already "highly deferential," *Knowles v. Mirzayance*, 556 U.S. 111, 124 (2009) (quotations and citations omitted), becomes "doubly" so on habeas review when "a state court has [already] decided that counsel performed adequately," *Dunn v. Reeves*, 594 U.S. 731, 739 (2021) (per curiam) (citation omitted). In this context, a petitioner must not only satisfy *Strickland*'s requirements, *Knowles*, 556 U.S. at 124, but he must also show that the state court's ruling was unreasonable, *id.* at 123.

To satisfy *Strickland*'s first prong, a petitioner "must show that counsel's representation 'fell below an objective standard of reasonableness' determined according to 'prevailing professional norms.'" *Murden v. Artuz*, 497 F.3d 178, 198 (2d Cir. 2007) (quoting *Strickland*, 466 U.S. at 688). This evaluation is made "from counsel's perspective at the time of and under the circumstances of trial." *Ibid.* (citing *Strickland*, 466 U.S. at 689). Because review of ineffective assistance claims in the habeas context is "doubly deferential," *Woods v. Etherton*, 578 U.S. 113, 117 (2016) (quoting *Cullen v. Pinholster*, 563 U.S. 170, 190 (2011)), counsel is "strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment," *ibid.* (quoting *Burt v. Titlow*, 571 U.S. 12, 22 (2013)). To establish *Strickland*'s second prong, prejudice, petitioner must both show (i) "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have

18

been different," *Strickland*, 466 U.S. at 694, and (ii) that the trial court's finding that he was not prejudiced was "unreasonable," *Knowles*, 556 U.S. at 123. The state court found that petitioner's claim fails both parts of *Strickland*'s test. *See* Post-Conviction Order 2–4.

On this record, petitioner has failed to show that the state court's rejection of his ineffective assistance claim was unreasonable. The state court found that petitioner had not demonstrated evidence from his attorney's asserted failure to advise him of the contours of a pretrial plea offer, noting that the only evidence of prejudice petitioner presented was his own self-serving statement—years after the fact—that he would have taken the offer if he knew the offer did not carry a potential life sentence. *Id*. at 3. On that thin record of support, petitioner has not shown that the state court's findings regarding prejudice were an unreasonable application of clearly established federal law. *See Page v. Martuscello*, 561 F. App'x 118, 119 (2d Cir. 2014) ("[W]e cannot reject the state court's conclusion that [petitioner] failed to establish that he was prejudiced by his counsel's error . . . [b]ecause [the Antiterrorism and Effective Death Penalty Act] requires us to defer to such state court factual findings.").

## CONCLUSION

For the foregoing reasons, the petition is denied. And because petitioner has not shown "that reasonable jurists could debate whether . . . the petition should have been resolved in a different manner or that the issues presented were 'adequate to deserve encouragement to proceed further,'" *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (quoting *Barefoot v. Estelle*, 463 U.S. 880, 893 & n.4 (1983)), a certificate of appealability under 28 U.S.C. § 2253(c)(2) is also denied.

19

The Clerk of Court is directed to enter judgment and close the case.

SO ORDERED.

*/s/ Rachel Kovner*
RACHEL P. KOVNER
United States District Judge

Dated: July 16, 2024
       Brooklyn, New York